**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 13-50849

United States Court of Appeals
Fifth Circuit

**FILED**

May 7, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

FRANCISCO ANTONIO COLORADO CESSA, also known as Pancho, also known as Francisco Antonio Colorado-Cessa; JOSE TREVINO MORALES; EUSEVIO MALDONADO HUITRON, also known as Chevo, also known as Eusevio Huitron-Maldonado; FERNANDO GARCIA-SOLIS, also known as Freddy, also known as Fer, also known as Fernando Solis Garcia,

Defendants–Appellants.

-------------------------------------------------
Consolidated with No. 13-51003

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

FRANCISCO ANTONIO COLORADO CESSA, also known as Pancho, also known as Francisco Antonio Colorado-Cessa,

Defendant–Appellant.

Appeals from the United States District Court
for the Western District of Texas

No. 13-50849; cons. w/ No. 13-51003

Before PRADO, ELROD, and HAYNES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This is an appeal from a money-laundering-conspiracy trial. The Los Zetas drug cartel entered the U.S. quarter-horse racing business. Los Zetas used their horse-racing operations to launder money. Four Defendants–Appellants involved in the horse-racing operations were convicted of conspiring to launder money in violation of 18 U.S.C. § 1956(h). They appeal, each challenging the sufficiency of the evidence, the jury instructions, and their sentences, among other claims of error. For the reasons stated below, we reverse the conviction of horse trainer Defendant–Appellant Eusevio Huitron as not supported by sufficient evidence that he joined the conspiracy knowing its purpose was to conceal the source or nature of illegal funds. We also vacate Defendant–Appellant Francisco Antonio Colorado Cessa's (Colorado) conviction because the jury was improperly instructed and we cannot say beyond a reasonable doubt that the jury's verdict as to Colorado would have been the same absent the error. Because sufficient evidence supports the other Defendants–Appellants' convictions and sentences and because the trial court did not otherwise commit reversible error, we affirm in all other respects.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The four Defendants–Appellants, Jose Trevino Morales, Francisco Antonio Colorado Cessa, Fernando Garcia–Solis, and Eusevio Maldonado Huitron (collectively "Appellants"), were indicted by a federal grand jury, along with fifteen other codefendants, for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Appellants appeal their convictions following a three-week jury trial in which fifty-four witnesses testified. The facts pertaining to each Appellant are recited in greater detail in discussion section below. An overview of the horse-racing money-laundering conspiracy is provided as background in Part I(A), and a general description of each

2

No. 13-50849; cons. w/ No. 13-51003

Appellant's role in the conspiracy is provided in Part I(B). On review of the sufficiency of the evidence, we view "the evidence and the inferences drawn therefrom in the light most favorable to the verdict." *United States v. Rosbottom*, 763 F.3d 408, 417 (5th Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 985 (2015). As such, in providing an overview of the criminal conspiracy, we summarize the evidence in that light.

**A.    Overview of the Conspiracy**

According to trial testimony, Los Zetas are a "cartel" that controls geographic areas within Mexico. The original group of Zetas was formed by the Mexican government as an armed special-forces unit to combat drug-cartel operations in Mexico, and the group was designated with the radio call sign "Zeta." A group of thirty Zetas deserted from the Mexican military under their then-commander, known as "Zeta 1," to work for the Gulf drug cartel as enforcers. In that role, they committed acts of domestic terrorism, bribed public officials and law enforcement, and fought other cartels, among other activities.

In about 2007 or 2008, Los Zetas split from the Gulf cartel. Los Zetas now control several Mexican cities and border-crossing points between Mexico and the United States. Los Zetas produce marijuana and methamphetamine in Mexico, import cocaine and methamphetamine precursor chemicals into Mexico, and export narcotics into the United States. Los Zetas make hundreds of millions of dollars annually from the import and sale of illegal drugs.[1]

Members of Los Zetas are assigned numbers in accordance with the order in which they joined the armed group, e.g., the seventh member was known as "Zeta 7." At the time of the trial, the leader of Los Zetas was Miguel Angel

---

[1] Jesus Rejon–Aguilar, also known as Zeta 7, was the former national supervisor of Los Zetas, and he estimated that the cartel took in about $350 million per year.

No. 13-50849; cons. w/ No. 13-51003

Trevino Morales, also known as "Zeta 40." His brother Oscar Omar Trevino Morales, also known as "Zeta 42," was second-in-command.

### 1. Money-Laundering Operations

Miguel and Omar Trevino used the proceeds of cocaine sales to purchase quarter horses[2] in the United States through legitimate-appearing intermediaries. They did so in part because the quarter-horse business "was a good business . . . to get clean money" from the proceeds of drug sales in the United States back into Mexico.

Los Zetas generated "clean money" by repeatedly "selling" horses to individuals or shell companies controlled by coconspirators. For instance, one horse, Blue Girls Choice, was initially purchased by Ramiro Villareal for $15,000 cash. The horse was then repurchased by Villareal at a different horse sale—this time for $135,000. Later, the horse was purchased for $30,000, and then repurchased again for $135,000. This same horse was bought and sold several times over between members of the conspiracy. Each transaction generated the appearance of legitimate cash proceeds. The horses were held in the names of multiple individuals and companies to conceal the true identity of their actual owner: Zeta 40, Miguel Trevino.[3]

Los Zetas paid for horse training, breeding, veterinary bills, and racing expenses with the proceeds of illegal drug sales. Miguel Trevino directed subordinates Mario Cuellar and Jose Vasquez to deliver cash payments for these expenses. Cuellar and Vasquez sold cocaine in the United States, and,

---

[2] The American quarter horse is a breed of horse bred to sprint short distances, and the breed is named for its success in races of a "quarter" of a mile or less.

[3] As one witness testified, "The pattern was these horses would change claims of ownership quite rapidly. Some of the companies are alias companies. The people's names on the AQHA [the American Quarter Horse Association] records are alias names. Some of them are real names. But th[ose] people did not purchase the horses or have anything to do with the horses."

rather than delivering all of the profits from these sales back to Mexico, they would deliver cash to the horse operation.[4]

Horse expenses also generated "clean cash." For instance, Tyler Graham, a manager at a quarter-horse-breeding farm, testified that members of the conspiracy would pay each other stud fees for Los Zetas' horses to inseminate other horses that Los Zetas already owned, generating "[s]everal hundred thousand" dollars in "clean money" in one year alone.

### 2. *Murders and Kidnapping*

Miguel Trevino ordered the killing of at least two individuals who either refused to cooperate in the money-laundering scheme or were cooperating with the authorities. Los Zetas purchased quarter horses through intermediaries. These intermediaries were often wealthy businessmen who were not under IRS investigation, so that law enforcement would not ask questions "about where the money [for the horses] was coming from." These individuals included Alejandro Barradas and Ramiro Villarreal. The government alleges that Appellant Colorado Cessa was among those who purchased horses on Los Zetas' behalf; this is discussed in greater detail below. A former leader of Los Zetas testified that Miguel Trevino ordered the murder of Ramiro Villarreal "because [Los Zetas' leaders] realized that he was cooperating with the U.S. authorities" after his arrest in Houston.[5] Miguel Trevino ordered the murder of Alejandro Barradas because he refused to allow the organization to register horses under his name as the owner.

---

[4] One witness described how Vasquez would ordinarily receive "a thousand kilos of cocaine a month" that he would then sell in the Dallas area, such that he would "send back maybe [$]3 or $4 million a week" to the cartel; however, he would pay horse expenses "out of whatever [he] was going to be sending . . . [s]o it was never [his] money. It was always their money."

[5] A DEA agent's testimony separately confirmed that Villarreal had indeed been cooperating with officials before his body was found at the scene of a "fiery" car crash.

A wealthy Mexican businessman, Alfonso Del Rayo, testified that members of Los Zetas kidnapped and extorted him, using the horse operation essentially to launder the ransom money. Several Zetas kidnapped and tortured Del Rayo and demanded a ransom of the equivalent of $4.5 million. Del Rayo was released nine days later, after sustaining severe injuries.

Soon thereafter, a Veracruz government official and Carlos Nayen (a coconspirator) approached Del Rayo "about [his] kidnapping." They instructed Del Rayo to travel to Oklahoma City to buy a horse, insisting this was for his own safety and that of his wife and children. Del Rayo flew to Oklahoma City, where he was met by Appellant Fernando Garcia–Solis and instructed to make the winning bid on a horse named Blues Ferrari, a horse purchased for $15,000 as part of the conspiracy. Del Rayo complied, purchasing the horse for $310,000. The manager of the Oklahoma City auction house testified that Del Rayo "looked like he had been in an accident." Indeed, the auction manager was so struck by Del Rayo's appearance that he took a photo on his cell phone (which was shown to the jury). He explained: "I'd never seen this person before and [he was] buying a very expensive horse, and I was just very concerned with the transaction at the time." Carlos Nayen later asked that Del Rayo send between $600,000 and $700,000 in checks to the operation's horse-breeding facility, and after Nayen's indictment, Nayen demanded the keys to Del Rayo's house in San Antonio and money to pay attorney's fees. Del Rayo understandably said he felt he could not refuse demands from Nayen or from other members of Los Zetas.

### 3. *Quarter-Horse Race Fixing*

Members of Los Zetas paid bribes to give Miguel Trevino's horse an unfair advantage at the 2010 All American Futurity Race—the Kentucky Derby of quarter-horse races. Mario Cuellar, a Los Zetas subordinate, testified that Miguel Trevino instructed him to pay $110,000 in bribes to gate starters—

$10,000 each—to give Trevino's horse, Mr. Piloto, an advantage in the race. With Miguel and Omar Trevino and other Los Zetas leaders watching the race via an internet connection, Mr. Piloto won the race by a nose—even though he had the slowest qualifying time. As a reward for having successfully paid off all the starters, Miguel Trevino rewarded Carlos Nayen with 10 kilograms of cocaine.

## B.     The Appellants' Roles in the Money-Laundering Conspiracy

Two of the Appellants were allegedly key players in the horse-racing and money-laundering operation. Jose Trevino Morales (Jose Trevino) is Miguel and Omar Trevino's brother, and he operated a horse ranch and related companies. With money from Los Zetas, he helped his brothers acquire as many as 500 horses. Francisco "Pancho" Colorado Cessa (Colorado) is a wealthy businessman who, the government alleges, acted as an intermediary through whom Los Zetas purchased horses. Colorado's relationship with Los Zetas began with Efrain Torres, also known as "Zeta 14," a now-deceased leader of Los Zetas. Torres gave Colorado $6 million in startup capital for Colorado's oil-services company, ADT Petro Servicios (ADT).

The other two Appellants, Eusevio Huitron and Fernando Garcia–Solis, had comparatively minor roles. Garcia–Solis translated for a Los Zetas subordinate, Carlos Nayen, and assisted Nayen with cash deliveries, auctions, and other aspects of the horse operations. Eusevio Huitron worked as a horse trainer for Miguel Trevino for nearly two years. He accepted significant cash payments from Los Zetas for his horse-training services—$505,007 in total.

Each Appellant's specific involvement in the conspiracy is discussed in greater detail below.

## II. DISCUSSION

The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's final

No. 13-50849; cons. w/ No. 13-51003

judgment. This Court has jurisdiction to review the district court's application of the U.S. Sentencing Guidelines under 18 U.S.C. § 3742(a). We analyze the sufficiency-of-the-evidence challenges first, before discussing the Appellants' evidentiary and jury-instruction claims of error. Finally, we discuss the Appellants' challenges to their sentences and to the money judgment.

## A.    Sufficiency-of-the-Evidence Challenges

Appellants all raise sufficiency-of-the-evidence challenges on appeal. As noted, all four Appellants were convicted of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). "To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) (citing *United States v. Meshack*, 225 F.3d 556, 573–74 (5th Cir. 2000)).

The indictment alleged "concealment money laundering" under § 1956(a)(1)(B)(i)[6] as the object of the conspiracy, meaning the Appellants conspired to conduct a financial transaction with proceeds of a specified illegal activity—here, distribution of controlled substances, extortion, and bribery in sporting contests—with the knowledge that the transaction's design was to conceal or disguise the source of the proceeds. As the government

---

[6] The government may indict and prove financial-transaction money laundering in two ways. *See infra* note 8 (explaining the difference between financial-transaction money laundering and transportation money laundering). It may either use the promotion alternative (intent to promote or further illegal actions) or it may use the concealment alternative (knowing that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds). *United States v. Valdez*, 726 F.3d 684, 689 (5th Cir. 2013). Because the indictment here only alleges concealment, the promotion prong does not pertain to the analysis. *See id.* (noting that if a defendant is "charged with both prongs in one count, the government may establish guilt under one prong or the other").

acknowledges, each Appellant preserved error by moving for judgment of acquittal at the end of the government's case and at the close of the evidence.

### 1. *Standard of Review*

The scope of this Court's review of the evidence supporting the Appellants' criminal convictions is narrow. *See United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). "In reviewing the sufficiency of the evidence, we view the evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007) (citations omitted). "The question is one of the sufficiency of the evidence, not its credibility." *United States v. Brown*, 553 F.3d 768, 780 (5th Cir. 2008).

### 2. *Applicable Law*

As an initial matter, Jose Trevino argues that a money-laundering conspiracy cannot be proven by circumstantial evidence. We disagree. We have specifically stated in the context of a sufficiency challenge to a money-laundering conspiracy that direct evidence "is unnecessary; each element may be inferred from circumstantial evidence." *Fuchs*, 467 F.3d at 906 (quoting *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994)). Indeed, as the Supreme Court has explained, "the knowledge element of the money-laundering offense—knowledge that the transaction involves profits of unlawful activity—[is] provable (as knowledge must almost always be proved) by circumstantial evidence." *United States v. Santos*, 553 U.S. 507, 521 (2008). We have noted more specifically that the agreement element "may be inferred from a 'concert of action.'" *Fuchs*, 467 F.3d at 906 (quoting *Casilla*, 20 F.3d at 603).

No. 13-50849; cons. w/ No. 13-51003

Contrary to Huitron's assertion,[7] "[t]he government need not prove an overt act in furtherance of the conspiracy." *Id.* (citing *Whitfield v. United States*, 543 U.S. 209, 219 (2005)).

### 3. Analysis

A principal issue in this appeal is whether sufficient evidence supports the conviction of Huitron, who worked as a horse trainer for Miguel Trevino and Los Zetas' horse-racing operation. Unlike in Huitron's case, sufficient evidence supports the conspiracy convictions of the Jose Trevino and Garcia–Solis. Colorado's sufficiency challenge presents a close question.

#### a. Huitron

The key issue is whether there is sufficient evidence to establish that Huitron joined the conspiracy knowing that the transaction in question—his horse-training services—was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of illegal activity beyond a reasonable doubt. Our discussion of Huitron's case informs our analysis of Jose Trevino's and Garcia–Solis's sufficiency challenges. Huitron maintains he "was paid for performing legitimate horse training services." He admits he was paid with drug proceeds, though he contends that he "was not aware of the money source[] for the legitimate horse training services [he] rendered." The government counters that because Huitron's client, Miguel Trevino often talked about how he used his horse operation to

---

[7] Huitron argues in his brief that "the government must prove beyond a reasonable doubt that . . . one of the persons committed an overt act in further[ance] of the conspiracy," citing *United States v. Armstrong*, 550 F.3d 382, 406 (5th Cir. 2008). Huitron's reliance on *Armstrong* is misplaced. As we recognized in *United States v. Guillermo Balleza*, *Armstrong* did state in dicta that an overt act was required; but in so doing, *Armstrong* mistakenly relied on a case that had been overruled by the Supreme Court in *Whitfield. See* 613 F.3d 432, 433 n.1 (5th Cir. 2010) (per curiam) ("We take this opportunity to clarify this court's jurisprudence on whether an overt act in furtherance of the conspiracy is an element of the offense of conspiracy to launder money in violation of 18 U.S.C. § 1956(h). It is not." (citing, *inter alia*, *Armstrong*, 550 F.3d at 403)).

No. 13-50849; cons. w/ No. 13-51003

clean money, Huitron's "pattern of receiving bulk cash payments is proof of his agreement to join the conspiracy." The government also contends that by "converting Los Zetas['] cash into well-trained horses that could earn Miguel Trevino clean money," Huitron "voluntarily joined the conspiracy, knowing its unlawful purpose and with intent to further that purpose."

### i. *Applicable law*

In the context of a concealment money-laundering conviction for transportation, the Supreme Court held that "merely hiding funds . . . is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." *Cuellar v. United States*, 553 U.S. 550, 563 (2008).[8] In *Cuellar*, the defendant was stopped while driving south toward the Mexican border. *Id.* at 553. Police searched the vehicle and discovered a secret compartment containing $81,000 in cash, and the defendant was convicted for transportation money laundering. *Id.* at 554, 568. The Supreme Court reversed. *Id.* at 568. The Court explained that evidence of concealment does not necessarily imply the purpose of the transport is to conceal: "[*H*]ow one moves the money is distinct from *why* one moves the money," and "[e]vidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 566.

The Fifth Circuit applied *Cuellar*'s reasoning to financial-transaction money laundering[9] in *United States v. Brown*, 553 F.3d 768, 786 n.56 (2008), and held that the government must demonstrate that the charged transactions had the purpose—not merely the effect—of "mak[ing] it more difficult for the

---

[8] Section 1956 enumerates separate offenses for transportation money laundering, § 1956(a)(1), and financial-transaction money laundering, § 1956(a)(2). *Cuellar* addressed the "designed to conceal" element in the transportation-money-laundering context. The Fifth Circuit held that "the *Cuellar* analysis applies with full force to the 'designed to conceal' element" in financial-transaction money laundering because the language "is identical in the two provisions." *United States v. Brown*, 553 F.3d 768, 786 n.56 (5th Cir. 2008).

[9] *See supra* note 8.

government to trace and demonstrate the nature of th[e] funds." *Id.* at 787. We noted that "a mere act of structuring could not support a concealment conviction." *Id.* at 787 n.62 (citing *United States v. Stephenson*, 183 F.3d 110 (2d Cir. 1999)). In *Brown*, we held that the "numerous acts [of structuring] are more clearly designed to conceal the nature of the moneys," and affirmed the conviction. *Id.* at 787 & n.62.

We elaborated on financial-transaction money laundering in *United States v. Valdez* and explained that "simply spending money in one's own name will generally not support a money laundering conviction." 726 F.3d 684, 690 (5th Cir. 2013) (quoting *United States v. Willey*, 57 F.3d 1374, 1385 (5th Cir. 1995)). "'In one sense,'" we said, "'the acquisition of *any* asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form. But the requirement that the transaction be *designed* to conceal implies that more than this trivial motivation must be proved.'" *Id.* (quoting *Willey*, 57 F.3d at 1384). Because "Valdez did not use false names, third parties, or any particularly complicated financial maneuvers, which are usual hallmarks of an intent to conceal," we held "there is insufficient evidence" to support his conviction of "concealment money laundering." *Id.*

We summarized the case law in *United States v. Trejo* and concluded that "these cases exemplify the courts' consistent reliance on some *additional evidence* beyond the bare transaction . . . itself to infer specific intent." 610 F.3d 308, 314 (5th Cir. 2010). We observed that "courts have often relied on proof that the defendant was aware of the inner workings of and/or extensively involved in the drug organization responsible for the criminal activity as circumstantial proof that he had the specific intent to promote its unlawful purpose." *Id.* at 315. In *Trejo,* we held that the evidence was insufficient to support the defendant's plea in part because the "[e]vidence regarding the

No. 13-50849; cons. w/ No. 13-51003

[defendant's knowledge of the] inner workings of the organization that hired him . . . is virtually nonexistent in the record." *Id.* at 318.[10]

Put another way, as we said in *United States v. Leonard*, "not every dollar spent in every transaction that can be traced to a specified criminal activity violates 18 U.S.C. § 1956(a)(1)(A)(i). 'To so interpret the statute' would 'convert the money laundering statute into a money spending statute.'" 61 F.3d 1181, 1185 n.2 (5th Cir. 1995) (quoting *United States v. Sanders*, 928 F.2d 940, 944 (10th Cir. 1991)).

By contrast, in *United States v. Rosbottom*, we affirmed a money-laundering conspiracy conviction because the evidence showed that the defendant was "intimately involved with many aspects of [the coconspirator's] finances." 763 F.3d 408, 418 (5th Cir. 2014). Specifically, the defendant was convicted for conspiring to help conceal funds from a coconspirator's bankruptcy proceedings. *Id.* at 411. The defendant "was the sole member of the shell corporations she helped establish to purchase the boat and plane, though both the boat and plane were under [her coconspirator's] control and neither was purchased using her funds." *Id.* at 418. She also "picked up the funds" used to purchase cashier's checks payable to her coconspirator "in a parking lot after another employee took the funds out of the safe." *Id.* We determined that a reasonable jury could conclude that the defendant and her coconspirator "worked in concert to conceal funds from the bankruptcy proceedings" and affirmed. *Id.* at 419.

---

[10] The defendant transported $330,426.56 in cash (via a hidden compartment in his car) from a known drug dealer in Florida to a known drug dealer in Mexico for a fee. *Trejo*, 610 F.3d at 318. Because "the incriminating facts show simply that Trejo signed on for a one-time trip to transport drug money for a dealer he did not know and . . . had never worked for in the past," we found the evidence insufficient. *Id.* Ultimately, because Trejo did not timely object, we found the error was not plain. *Id.* at 318–19.

*ii.   Analysis*

Drawing all reasonable inferences in favor of the government, the evidence establishes, at best, that Huitron knowingly accepted drug money from known drug dealers in exchange for horse-training services. Although this had the effect of concealing the proceeds of Los Zetas' illegal activities, that alone is not enough to show that Huitron joined the conspiracy knowing its purpose was to conceal the source or nature of the funds. *See Cuellar*, 553 U.S. at 567. Every Government witness who testified about Huitron testified that he was a reputable horse trainer and that he was not involved in Los Zetas' illegal bribery, extortion, or drug-trafficking activities. For instance, Mario Cuellar, a former Los Zetas leader turned Government witness, gave the following testimony:

Q. Do you know if [Huitron] trained horses for "40"?

A. Yes, sir.

Q. And what do you know about that?

A. That that's what he is. He is one of the best horse trainers in Texas. He's the one that really makes all the other trainers in Texas run for their money. He's a good trainer.

Mario Cuellar further testified that Huitron did not traffic in cocaine, and that the bills he submitted to Los Zetas for reimbursement "were for the actual training and feeding and racing the horses." Raul Guadalajara, another Los Zetas subordinate and Government witness, testified that he and Mario Cuellar never told Huitron that they were drug dealers, and that, in fact, they tried to keep that fact hidden from Huitron. When asked about whether he knew Huitron's role in the organization, Guadalajara testified that "he trained the horse for '40.' That's all I knew." Another Los Zetas subordinate and drug dealer testified that, when he delivered $40,000 in cash to Huitron per Miguel Trevino's instructions, he never told Huitron "this is drug money." For all the

14

subordinate knew, Huitron lived "close to Austin, [and] trained horses." Jesus Rejon, another Los Zetas subordinate and government witness, testified that Huitron trained horses in Ruidoso, New Mexico, and that "he was there managing, you know, overseeing the [horse] training." Rejon testified that Huitron did not give him any information about Los Zetas' illegal activities in Mexico, explaining: "We didn't really talk about that."

As mentioned above, it is undisputed that Huitron trained horses for Miguel and Oscar Trevino and other members of Los Zetas for about two years at a rate of $1,100 per horse. He also received reimbursement for expenses, stall rentals, entry fees, shoeing, and bonuses if the horses he trained won races. He had a reputation as being among "the best horse trainers in Texas."

It is also undisputed that, when Huitron started training horses for Los Zetas, his inflow of cash substantially increased. An IRS agent reviewed the bank records of Huitron Homes, a company controlled by Eusevio Huitron and his brother Jesus.[11] According to the testimony of the IRS agent, in the eighteen months before Huitron started training the Trevinos' and Los Zetas' horses, Huitron Homes' bank account received a total of $113,000 in cash deposits. On July 12, 2010, Huitron Homes received a large structured cash deposit presumably representing a cash payment from Los Zetas. Over the next twenty-two months, while Huitron trained horses for Los Zetas, Huitron Homes received a total of $505,007 in structured cash deposits.[12] The government correctly points out that the evidence that Huitron received large cash payments is "overwhelming."

---

[11] Huitron's brother, Jesus Huitron, was also indicted for conspiracy to commit money laundering, but the jury found him not guilty.

[12] The deposits were "structured" in that each was less than $10,000, ostensibly to avoid reporting requirements. Though this may constitute the separate crime of structuring, Huitron was not indicted for committing that crime in this case.

No. 13-50849; cons. w/ No. 13-51003

The question becomes whether receiving large cash payments from known drug dealers, and subsequently structuring them, can support a conviction for conspiracy to commit financial-transaction money laundering, i.e., whether this constitutes sufficient circumstantial evidence that the financial transactions had the purpose, not merely the effect of "mak[ing] it more difficult for the government to trace and demonstrate the nature of th[e] funds." *Brown*, 553 F.3d at 787.

As we instructed in *Trejo*, there must be "some *additional evidence* beyond the bare transaction . . . itself to infer specific intent" to join a conspiracy to commit financial-transaction money laundering. 610 F.3d at 315. A defendant's awareness of the inner workings of, or extensive involvement in, the drug organization responsible for the criminal activity is significant circumstantial evidence of a defendant's specific intent. *Id.*

On this point, the government stresses Huitron's personal relationship with Los Zetas' leader, Miguel Trevino, and his knowledge about Los Zetas' illegal activity as circumstantial evidence of Huitron's specific intent to join the money-laundering conspiracy. The government points to testimony that, on one occasion, Huitron met with Miguel Trevino in Mexico,[13] and that he trained a horse named Mr. Jess XL (Roman numerals for forty), which by its name connects the horse—and its trainer—to Miguel Trevino and then to Los Zetas. The government also points to testimony from a manager of a quarter-horse breeding farm. The manager testified that Huitron told him, in a conversation about the deaths of Alejandro Barradas and Ramiro Villareal,[14] that "he heard he'd been kidnapped . . . [a]nd never came back." The manager

---

[13] A Government witness testified that he saw Huitron and Miguel Trevino together in Mexico talking at a table, but he did not hear the substance of their conversation.

[14] *See supra* Part I(A)(2).

16

also noted that Huitron "didn't indicate anybody specifically" who might have killed them.

The government also states that its "best evidence of Eusevio Huitron's knowledge came from the testimony of [Raul] Guadalajara," a Los Zetas subordinate and Government witness. Guadalajara related an anecdote about an instance where he dropped off $15,000 in cash and joked to Huitron that he was delivering "kilos." Guadalajara testified that Huitron got upset and called Miguel Trevino to complain, and Guadalajara "got in trouble with that back there in Mexico." From this evidence, the government argues, "[t]he jury could reasonably infer . . . that Eusevio Hutiron knew that Los Zetas dealt in kilogram quantities of narcotics . . . ." Further, another horse trainer testified that it was "an open secret in the horse-racing business" that Los Zetas were involved in the horse business.

This evidence, viewed in the light most favorable to the government, certainly establishes that Huitron knew he was being paid in drug money by known drug dealers. But it does not establish that Huitron voluntarily joined the conspiracy, "knowing its purpose and with the intent to further the illegal purpose," *Fuchs*, 467 F.3d at 906. We have held that merely providing services to a known drug dealer and accepting the proceeds of the illegal activity as payment is insufficient as a matter of law to establish criminal liability for money laundering. *See Trejo*, 610 F.3d at 318.

There must be some additional circumstantial evidence of intent to further the illegal conspiracy. *See Fuchs*, 467 F.3d at 906. As mentioned above, the evidence in the light most favorable to the government establishes that Huitron was a horse trainer for Los Zetas for a period of two years—and nothing more. It does not establish that he was aware of the inner workings of Los Zetas' criminal narcotics-trafficking organization. *Cf. Trejo*, 610 F.3d at 316 ("[E]vidence of a defendant's knowledge about the internal operations of a

No. 13-50849; cons. w/ No. 13-51003

drug organization . . . may [be] relied upon to establish his specific intent . . . ."). Here, the evidence merely demonstrates that Huitron had heard that two men had been kidnapped and one had been killed, and that Huitron contacted Miguel Trevino about a joke to which he apparently took offense. We hold that this is not enough circumstantial evidence from which a reasonable jury could conclude beyond a reasonable doubt that Huitron intended to further Los Zetas' illegal activities.

The government also argues that, by training horses that had been purchased with drug money in exchange for drug money, Huitron was "converting" Los Zetas' drug proceeds "into well-trained horses that could earn Miguel Trevino clean money," i.e., that the horse operations were part of one grand money-laundering scheme. We disagree. The Fifth Circuit previously rejected a similar argument. In *United States v. Brown*, the government similarly argued that a defendant who used his car dealership to systematically overcharge customers in violation of statutes prohibiting mail fraud also committed money laundering by paying ordinary business expenses using the fraud proceeds. 186 F.3d 661, 669 (5th Cir. 1999). The government's theory was that "the transactions . . . promoted the ongoing and future criminal activity . . . because the operation of the dealership was one grand scheme to defraud." *Id.* The Fifth Circuit rejected this "creative argument." *Id.* at 670. Absent "evidence of, say, payments for postage for mailing fraudulent warranty claims," this Court explained, there was insufficient evidence "to establish an intent to promote fraud," and we reversed. *Id.* at 670–71.

So too here. As in *Brown*, there is no evidence that Huitron joined the conspiracy knowing the conspiracy's purpose was to conceal drug money to be used, say, to bribe a gate starter; to front money for drug operations; or to send clean money back to Los Zetas for their personal use. That Los Zetas used the overall horse-racing scheme to launder money is insufficient to establish

18

*Huitron*'s guilt by mere association—absent additional circumstantial evidence that Huitron joined the conspiracy knowing that the horse-racing proceeds would be used to further the conspiracy to conceal the nature or source of illegal funds. Training racehorses does not, on its face, indicate an intent to promote or conceal the proceeds of money-laundering, extortion, or drug trafficking even though the overall conspiracy involved using horse racing to launder illegal proceeds. *See Brown*, 186 F.3d at 671.

The government cites several cases in support of Huitron's conviction, but these cases are distinguishable. First, the government cites *United States v. Gallo*, 927 F.2d 815, 820–21 (5th Cir. 1991), for the proposition that "close association with co-conspirators" can be "one factor that the jury may rely on." The government's discussion of this case leaves something out; the full quoted sentence reads: "Although mere presence at the scene of the crime or close association with co-conspirators *will not alone support an inference of participation in a conspiracy*, presence or association is one factor that the jury may rely on, *along with other evidence*, in finding conspiratorial activity by a defendant." *Id.* at 820 (emphasis added) (quoting *United States v. Magee*, 821 F.2d 234, 239 (5th Cir. 1987)). Moreover, in *Gallo*, we observed that the defendant's concerted action—unlike Huitron's innocuous horse training—was quintessential drug-trafficking behavior. *Id.* at 821.

Finally, *Fuchs* merely holds that a concert of action may support a conviction. 467 F.3d at 905–06. Here, there was no evidence of concerted action, but rather a series of transactions in which Los Zetas paid Huitron bulk cash payments in exchange for his training their horses. Huitron merely trained horses; he was not also charged under the substantive money-laundering provisions (that prohibit structuring to avoid reporting requirements, for instance) or for other criminal acts, but rather for *conspiracy* to commit money laundering under § 1956(h). And unlike the defendant in *Rosbottom*, there is

No. 13-50849; cons. w/ No. 13-51003

no evidence that Huitron was "intimately involved with many aspects of [Los Zetas'] finances," or that he formed shell entities to protect the identity of the true owners. *See* 763 F.3d at 418.[15]

Therefore, we reverse the conviction of Eusevio Huitron and render a judgment of acquittal because the government's evidence was not sufficient to permit a reasonable jury to infer beyond a reasonable doubt that Huitron voluntarily joined the conspiracy knowing its purpose was to conceal the source or nature of illegal proceeds. *See Cuellar*, 553 U.S. at 567–68.

### b. *Jose Trevino*

Jose Trevino similarly argues there is insufficient evidence to show that he knew the funds involved were the proceeds of illegal activities or that he knew the transactions he was involved in were designed to conceal or disguise the nature or source of the funds. We disagree and affirm.

Unlike Huitron, the record viewed in the light most favorable to the verdict includes additional evidence—beyond transactions involving illegal proceeds—from which a reasonable jury could conclude Jose Trevino voluntarily joined the conspiracy knowing its purpose was to conceal the nature or source of illegal proceeds. *See Cuellar*, 568 U.S. at 567–68. Jose Trevino experienced sudden wealth through his involvement in the money-laundering conspiracy. *See United States v. Alaniz*, 726 F.3d 586, 603–04 (5th Cir. 2013) (considering "sudden wealth" in evaluating the sufficiency of the evidence to support convictions for conspiracy to commit money laundering). An expert witness testified that, from 1990–2009, Jose Trevino and his wife

---

[15] The government also relies on *United States v. Adair*, 436 F.3d 520, 524 (5th Cir. 2006) ("It is sufficient for the defendant merely to be aware of the perpetrator's intent to conceal or disguise the nature or source of the funds." (quoting § 1956(h)). But the issue there was not intent to promote illegal activity, but rather whether a defendant could be convicted of conspiracy to commit money laundering in a sting operation, even though the money was not, in fact, the proceeds of actually illegal activity. *Id.* Thus, *Adair* is inapplicable.

earned on average $22,000 a year. During the period of the horse-racing conspiracy, his income jumped to $5.4 million over 30 months, or $2.1 million per year.

Circumstantial evidence supports the inference that Jose Trevino was aware of Los Zetas' illegal activities. *See Trejo*, 610 F.3d at 315. Jose Vasquez, a Los Zetas drug dealer, testified that he delivered hundreds of thousands of dollars in cash proceeds from the sale of cocaine to Jose Trevino. Mario Cuellar, a former Los Zetas leader, testified that Jose Trevino was aware of his brothers' involvement in the drug business, but that initially "Jose wanted nothing to do with the drugs, [and] he had worked really hard [and] was a straight person." But that all changed when a horse named Tempting Dash was purchased for him.

Additionally, the jury heard testimony that Miguel and Omar Trevino were particularly well-known leaders of an international drug cartel. The government also obtained Jose Trevino's computer on which it found photos of cash, of Miguel Trevino, and of a person detained in Mexico with a letter 'Z' on his chest. From this evidence, a reasonable jury could conclude Jose Trevino was aware that Los Zetas were involved in illegal activity.

Finally, circumstantial evidence supports the inference that Jose Trevino was aware that the transactions were designed to conceal or disguise the nature or source of the illegal proceeds. Witnesses testified that horses involved in the conspiracy were registered to Jose Trevino and his various LLCs. *Cf. Rosbottom*, 763 F.3d at 418 (affirming money-laundering conspiracy conviction where the defendant "was the sole member of the shell corporations she helped establish to purchase the boat and plane, though both the boat and plane were under [her coconspirator's] control and neither was purchased using her funds"). The evidence further shows that Jose Trevino repeatedly registered horses under various names, and that he set up at least one LLC for

21

the horse business. On one occasion, Jose Trevino sold his horse at auction to Alfonso Del Rayo, who testified that he had been kidnapped, tortured, and forced to purchase the horse no matter the price. The horse was purchased for substantially more money than it was worth, generating the appearance of legitimate funds. A reasonable jury could infer from this evidence that Jose Trevino was aware of the conspiracy's purpose to conceal or disguise the nature of the illegal proceeds.

We reject Jose Trevino's suggestion that he was convicted for mere guilt by association vis-à-vis the criminal activities of his brothers. As summarized above, the evidence shows that Jose Trevino involved himself in the horse-racing money-laundering operations, and we are convinced the jury appropriately considered this evidence in returning the guilty verdict.

Therefore, we conclude that Jose Trevino's conviction is supported by sufficient evidence.

### c.  Garcia–Solis

Fernando Garcia–Solis acted as a translator for Los Zetas, and he also argues insufficient evidence supports his conviction for conspiracy to commit money laundering. Garcia–Solis contends the government did not prove that he "knew that the funds used by himself and his clients were the proceeds" of illegal activity, and did not establish that "he knowingly and willfully joined into a conspiracy to launder such proceeds." He argues the evidence merely shows that he acted as a buyer for Jose Trevino and Colorado, and that he was unaware of their connection to Los Zetas.

The record does not support Garcia–Solis's argument. Instead, the evidence shows that he acted in concert with coconspirators. Specifically, witnesses testified that Garcia–Solis almost always accompanied and acted as translator for Carlos Nayen, a key subordinate in the conspiracy who could not speak English. Together, Nayen and Garcia–Solis attended at least seven

No. 13-50849; cons. w/ No. 13-51003

different horse auctions and purchased numerous "expensive" horses on behalf of Los Zetas and Miguel Trevino. During the bidding, Nayen was in constant contact with Miguel Trevino. Further, when Del Rayo—exhibiting serious injuries—was forced to pay $310,000 for Blues Ferrari at an auction in Oklahoma City, Del Rayo was escorted by Garcia–Solis and Carlos Nayen. After horse trainers got wind that federal authorities were looking for Miguel Trevino at a racetrack, Garcia–Solis received an email instructing him to "toss your cell."

From this evidence, the jury could reasonably conclude beyond a reasonable doubt that Garcia–Solis voluntarily joined the conspiracy, knowing its unlawful purpose and with intent to further that purpose. *See Fuchs*, 467 F.3d at 906.

### d. Colorado

Colorado also argues that insufficient evidence supports his conviction because the government failed to prove that Colorado knowingly used illegal proceeds to purchase horses. Although we agree with Colorado's argument that the government failed to introduce sufficient evidence on that point—which was the government's theory of the case—we hold that the government's evidence supports Colorado's conviction on a different theory; namely, that Colorado purchased the horses with the knowledge that they would be used as part of a larger money-laundering conspiracy. This knowledge is some circumstantial evidence that he voluntarily joined a conspiracy knowing its purpose was to conceal the source or nature of illegal funds. *See Cuellar*, 553 U.S. at 567. However, the issue is close, as the government offered weak circumstantial evidence based largely on Colorado's personal relationships with Los Zetas' leaders that Colorado's knew the conspiracy's purpose was to conceal the nature or source of illegal proceeds. As we explain *infra* at Part II(C), the erroneous jury instruction on commingling, viewed in light of the

23

sparse evidence of Colorado's guilt, requires that Colorado's conviction be vacated.

**B.    Asserted Error in Receiving the Testimony of Spanish-Speaking Witnesses Before Ruling on Objections**

Jose Trevino argues the district court constructively deprived him of his Sixth Amendment right to effective assistance of counsel by "allow[ing] witnesses to first answer the question . . . , and then only if the district court decides that the answer to the question is not admissible, the district court will sustain the objection (after the jury of course hears the answer)." The government clarifies that the district judge followed this procedure only with respect to *translated* testimony. The government contends that district courts have broad discretion in the conduct of courtroom procedures, and that a "constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances . . . are so egregious that the defendant was in effect denied any meaningful assistance at all," quoting *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000).

Although Jose Trevino's argument that the district court abused its discretion has force, we agree with the government and hold that any error was harmless. "[A] district judge has broad discretion in managing his docket, including trial procedure and the conduct of trial." *United States v. Gray*, 105 F.3d 956, 964 (5th Cir. 1997) (internal quotation marks omitted). Accordingly, appellate courts review a district judge's conduct of the trial to determine whether the cumulative effect amounts to an abuse of discretion. *Id.* Moreover, any prejudicial remarks "may be rendered harmless by curative instructions to the jury," *United States v. Millsaps*, 157 F.3d 989, 993 (5th Cir. 1998), and "juries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (internal quotation marks omitted).

No. 13-50849; cons. w/ No. 13-51003

We find Jose Trevino's argument persuasive and agree that the manner in which the district court received testimony from Spanish-speaking witnesses was problematic—treading dangerously close to an abuse of discretion. The district judge expressed frustration with having to ask the jury to leave each time a defense lawyer wished essentially to make an offer of proof in response to an objection to a question put to a Spanish-speaking witness, and the judge suggested an alternative approach:

> [THE COURT:] But, counsel, it's not a good way to proceed to ask a question, have an objection. *I don't know how many people . . . on the jury understand Spanish, but I do know some do because they have indicated in their answers.* And so, if I sustain the objection without an instruction, I don't know that your objection was very informative.
>
> *But I think we're going to have to let the answer come, then make your objection, and then, if I think it's not admissible, I'll instruct them they can't consider it for any purpose.* Now, a lot of people don't think that's a good remedy, but that's the only one that we have, as far as I know. And I'm not aware of any jury that's ever not done that because I've questioned jurors afterwards. But that's a very unscientific proof.
>
> MR. WOMACK [Garcia–Solis's attorney]: Your Honor, now that we know the answer that's coming as inadmissible, I would ask that we do keep it cut off where it is. Your Honor will give the proper instruction to the members – to the jurors not to consider whether the answer would have been and for those who –
>
> THE COURT: Oh, I'll do that now. But I'm talking about the next question and the one after that.
>
> MR. WOMACK: Oh, yes, sir.
>
> THE COURT: I don't want the jury having to lea[ve] on each question and hearing the answer.
>
> MR. ESPER: Your Honor, I concur with the Court. I believe the jury's followed the Court's instructions to disregard. However, unequivocally, they're humans, they've heard the answer. It's walking a fine line. I know they follow the Court's instructions. I

25

No. 13-50849; cons. w/ No. 13-51003

believe that. But sometimes they hear an answer and it's that bell sometimes doesn't get – the vibration doesn't get out of their brain.

. . . .

THE COURT: I'm going to sustain the objection and tell them not to consider that for any purpose. And then, I will tell them, again, that the official interpretation is what they have to have.

(emphasis added). Importantly, when the jury returned, the judge instructed them to consider only the official interpretation and to disregard the answer in Spanish.

We find that the district judge's conduct of the trial in this manner was problematic and may amount to an abuse of discretion, but that any error was either harmless or not plain. Jose Trevino does not point to any prejudice to his case—let alone to cumulative prejudice so as to amount to a reversible error in light of the district court's significant discretion over the mode and manner of witness testimony. *See Gray*, 105 F.3d at 964. Moreover, any prejudice from the district court's problematic procedure in this case is presumptively cured by the judge's instructions to the jury. Jose Trevino does not attempt to rebut this presumption—a tall task in light of the substantial evidence of his guilt summarized above. *See Millsaps*, 157 F.3d at 993. Third, the record does not indicate that Jose Trevino objected,[16] so our review is for plain error only. Because Jose Trevino does not direct the court to authority finding error in similar circumstances, any error on the district court's part was not obvious or plain.

Jose Trevino's argument that he was constructively deprived of counsel is also unavailing. "A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's

---

[16] The only statement indicating disagreement came from Garcia–Solis's attorney, Mr. Womack, not from Jose Trevino's counsel. Garcia–Solis does not challenge the manner in which Spanish-speaking witnesses were questioned on appeal.

ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." *Gochicoa*, 238 F.3d at 284 (internal quotation marks omitted). Because there is no evidence that Jose Trevino's counsel was absent from the courtroom or suffered from a material conflict of interest with his client, *see id.*, Jose Trevino's asserted constructive deprivation of counsel does not fit within this narrow spectrum.

Therefore, although we find the manner in which the district court conducted the trial proceedings in this case problematic for the reasons identified by Jose Trevino, we do not find a reversible error.

## C.    Jury Instructions

A close question in this appeal is the asserted jury-instruction error. Three of the four Appellants—Jose Trevino, Colorado, and Garcia–Solis— challenge the jury instruction describing the commingling of funds. The district court instructed the jury regarding the "intent to conceal or disguise" element as follows: "With respect to the fourth element, the commingling of illegal proceeds with legitimate business funds *is evidence of intent to conceal or disguise*. Therefore, it would not be a defense that legitimate funds were also involved in a transaction involving illegal and legitimate funds combined." (emphasis added). The Appellants contend this instruction (1) "had no support in the evidence" and (2) "amounted to a mandatory presumption—effectively directing the jury to infer intent to conceal and disguise from evidence of commingling." The government counters the district court correctly stated the law because "[i]t is well-established that commingling illegal proceeds with legitimate business funds is evidence of a defendant's intent to conceal," citing *United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002). The government also argues that "the jury heard evidence that [Colorado] commingled drug proceeds into his ADT account."

27

We hold that the district court abused its discretion in instructing the jury in this manner, but that the erroneous jury instruction constituted harmless error as to Jose Trevino and Garcia–Solis. Because the circumstantial evidence of Colorado's guilt is weaker, we cannot say beyond a reasonable doubt that the verdict would have been the same as to Colorado, and we vacate his conviction and remand.

### 1. *Standard of Review*

This Court reviews jury instructions "for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury." *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011) (internal quotation marks omitted). In so doing, we consider "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *Id.* (internal quotation marks omitted). "The trial court's charge must not only be 'legally accurate, but also factually supportable'; 'the court may not instruct the jury on a charge that is not supported by evidence.'" *United States v. Mendoza–Medina*, 346 F.3d 121, 132 (5th Cir. 2003) (quoting *United States v. Lara–Velasquez*, 919 F.2d 946, 950 (5th Cir. 1990)). In assessing whether evidence sufficiently supports a particular jury instruction, this Court views "the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the Government." *Id.* (internal quotation marks omitted). "Any error is subject to harmless-error review." *Id.*

### 2. *The District Court's Commingling Instruction Was an Abuse of Discretion*

We agree with Defendants–Appellants that the district court abused its discretion by giving the commingling instruction it gave. "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a

No. 13-50849; cons. w/ No. 13-51003

possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Francis v. Franklin*, 471 U.S. 307, 314 (1985) (footnote omitted). The analysis turns "initially on the specific language challenged," but "the potentially offending words must be considered in the context of the charge as a whole." *Id.* at 315.

The district court's instruction spoke in mandatory terms: "[T]he commingling of illegal proceeds with legitimate business funds *is* evidence of intent to conceal or disguise." *Cf. Franklin*, 471 U.S. at 314. Because the mandatory language was not clarified with an accompanying caveat—indicating that the jury *may* but *need not infer* intent to conceal from the commingling of illegal proceeds, *see id.* ("A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion.")—we conclude that the instruction treads dangerously close to an unconstitutional mandatory presumption.

The government is correct that this instruction was a correct description of the law: our case law does instruct that "[e]vidence that the defendant commingled illegal proceeds with legitimate business funds is sufficient to support a conviction under § 1956," particularly when the defendant also subsequently used the commingled funds to purchase equipment to further illegal activities. *See Rodriguez*, 278 F.3d at 491 (affirming § 1956 conviction for money laundering in part because the defendant used commingled funds to purchase a van for his illegal-alien transporting scheme). But we have not approved this statement of the law as a *jury instruction*, nor would we. A jury instruction must make clear that the inference is permissive and not mandatory, and the instruction given here does not do so.

The government defends the commingling instruction and directs us to a Ninth Circuit case in which the court evaluated similar language: *United*

29

*States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987). There, the court considered a challenge to a jury instruction reading: "Use of a weapon or other instrument in a way that causes death *is evidence of* malice aforethought." *Id.* (emphasis added). The court reasoned that "[a]dvising the jury that it may treat the use of a deadly weapon as evidence of malice aforethought is not the same as *requiring* it to presume or infer malice aforethought from that evidence." *Id.* at 225–26.

Colorado in reply points out that the Ninth Circuit's model instruction at issue in *Washington* was accompanied by the following:

> If it is shown that the defendant used a deadly weapon in the commission of a homicide, then you *may* find, from the use of such weapon, in the absence of explanatory or mitigating circumstances, the existence of the malice which is an essential element of the offense. *You are not obliged to so find*, however.

*Id.* at 226. Colorado continues that "[n]o such language accompanied the district court's commingling instruction here."

We agree with Colorado's interpretation of *Washington*. Confronted with the instruction given here, a reasonable juror could conclude that evidence of commingling obligated the jury to infer intent to conceal. The clarifying language in *Washington* distinguishes that case from this one. Unlike in *Washington*, the trial court here did not state that the evidence of commingling merely permitted—but did not oblige or require—the jury to infer intent to conceal. *See Hammontree v. Phelps*, 605 F.2d 1371, 1379–80 (5th Cir. 1979). Moreover, the district court should have followed the reasoning in *Washington* and included similar language clarifying that the inference was permissive and not mandatory. Because the instruction given did not include guidance clarifying that the inference was permissive and not mandatory, we conclude

No. 13-50849; cons. w/ No. 13-51003

that the district court's commingling jury instruction constituted an abuse of discretion.[17]

### 3. Harmless-Error Analysis

Nevertheless, we find that the erroneous jury instruction was harmless as to Jose Trevino and Garcia–Solis. Erroneous jury instructions are harmless if a court, "after a 'thorough examination of the record,' is able to 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *United States v. Skilling*, 638 F.3d 480, 482 (5th Cir. 2011) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)); *accord Rose v. Clark*, 478 U.S. 570, 580–81 (1986) (holding that harmless-error review applies to erroneous burden-shifting jury instructions).

Here, as in *Clark*, there is no doubt that the "trial court properly could have instructed the jury that it could *infer*," 478 U.S. at 581, intent to conceal from evidence of commingling. Examining the jury instructions "as a whole, as we must" in assessing the harmlessness of an erroneous instruction, *Garcia v. Quarterman*, 454 F.3d 441, 449 (5th Cir. 2006), apart from the challenged commingling instruction, we see that the jury in this case was clearly instructed that it had to find Appellants guilty beyond a reasonable doubt as to every element, *see Clark*, 478 U.S. at 579. Further, after a thorough examination of the record, we agree with the government that the record contains ample circumstantial evidence of Jose Trevino's and Garcia–Solis's knowledge that the money-laundering conspiracy's purpose was to conceal the source or nature of illegal proceeds. Accordingly, we conclude beyond a reasonable doubt that the jury verdict as to Jose Trevino and Garcia–Solis would have been the same had the jury been properly instructed. *See United*

---

[17] Because we find that the jury instruction constituted an abuse of discretion, we need not and do not reach Appellants' alternative argument that the evidence did not support this instruction.

*States v. Parker*, 73 F.3d 48, 52–53 (5th Cir.) ("[B]ecause the trial judge's ruling was a correct statement of the law and the jury found that the underlying predicate acts did occur, the error did nothing to change the outcome of the case because under a correct application of the law, the verdict would have been guilty regardless."), *reh'g en banc granted and opinion vacated*, 80 F.3d 1042 (5th Cir. 1996), *and opinion reinstated in pertinent part on reh'g*, 104 F.3d 72 (5th Cir. 1997).

We do not reach the same conclusion with respect to Colorado, however. The government repeatedly argued that, because Colorado purchased horses with funds from his company, ADT, and ADT was started with drug money in 2003 and 2004, Colorado therefore knowingly purchased horses in furtherance of the money-laundering conspiracy. But the horse-racing money-laundering conspiracy did not begin until 2008. Accordingly, our review of the record reveals no evidence from which a reasonable factfinder could trace Colorado's horse purchases to illegal proceeds—or to illegal proceeds that had been commingled with legitimate funds. At best, the evidence shows that Colorado purchased 121 horses on behalf of conspiracy members using ADT funds and that he was closely associated with members of Los Zetas. While this might be evidence from which a properly instructed jury could infer that Colorado knowingly joined the money-laundering conspiracy—an issue on which we express no opinion—we cannot say "beyond a reasonable doubt that the jury verdict would have been the same absent the erro[neous]'" jury instruction given in this case. *See Skilling*, 638 F.3d at 482. This is particularly so given that the government's expert witness specifically testified that Colorado "commingled personal and business" funds and expenses: a confused jury may have inferred from this testimony together with the erroneous instruction that the jury was obligated to infer from this evidence an intent to conceal.

No. 13-50849; cons. w/ No. 13-51003

Therefore, the district court abused its discretion in giving the commingling jury instruction it gave. The error was harmless as to Jose Trevino and Garcia–Solis. Because of the centrality of the commingling issue to Colorado's conviction and the weak circumstantial evidence of his guilt, we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same as to Colorado had the jury been properly instructed. Accordingly, we affirm the convictions of Jose Trevino and Garcia–Solis, but we vacate the conviction of Colorado.

## D.  Sentencing

Garcia–Solis and Jose Trevino challenge their sentences. Specifically, they contend the district court erroneously increased their offense level for violation of § 1956 based on the value of the laundered funds under U.S. Sentencing Guidelines Manual ("U.S.S.G.") §§ 2S1.1(a)(2); 2B1.1, among other assorted asserted errors. The district court based its calculation of the offense level on the presentence investigation report's (PSR) application of application note 3(b), which provides: "If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds." The government counters that the Appellants did not meet their burden to show the calculation was erroneous and that, even if it were, the error was harmless. We agree with the government.[18]

### 1. Standard of Review

"A sentence within the properly calculated Guidelines range is presumed reasonable on appeal." *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009). "Findings of fact used in calculating the Guidelines range are reviewed

---

[18] Since we vacate Colorado's conviction because the jury was improperly and harmfully instructed, we need not and do not address his challenges to the sentence and to the money judgment.

for clear error, while interpretation of the Guidelines themselves is reviewed de novo." *Id.* "Calculation of total laundered funds is a factual finding, which need only be determined by a preponderance of the evidence, and is reviewed only for clear error." *United States v. Yassine*, 574 F. App'x 455, 466 (5th Cir.) (per curiam), *cert. denied*, No. 14-6941, 2014 WL 5502919 (U.S. Dec. 8, 2014). "A factual finding on a sentencing factor is not clearly erroneous so long as it is plausible in light of the record read as a whole." *Alaniz*, 726 F.3d at 622 (internal quotation marks omitted).

### 2. *Jose Trevino's Sentence*

Jose Trevino argues that the scheme only involved $1,734,000, so the district court's finding that he was responsible for $25,000,000 in laundered funds was clearly erroneous. He also contends the district court erroneously concluded that he was a leader or supervisor within the meaning of U.S.S.G. § 3B1.1(c), that the money-laundering scheme was "sophisticated" under U.S.S.G. § 2S1.1(b)(3), and that Jose Trevino knew it involved drug proceeds under U.S.S.G. § 2S1.1(b)(1)(B)(i). We disagree.

Jose Trevino points to no evidence that rebuts the PSR's analysis or establishes that the district court's factual finding was clearly erroneous. As described in detail above, the money-laundering scheme was sophisticated, involving multiple layers of leadership and organizations, including fictitious entities and shell corporations. *See* U.S.S.G. § 2S1.1 cmt. n.5(A) ("[S]ophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. [§] 1956 offense. Sophisticated laundering typically involves the use of (i) fictitious entities; (ii) shell corporations; [or] (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate . . . ."). Additionally, the district court had "no trouble finding" that Trevino "exercised leadership," citing the thirteen

or fourteen employees at the horse ranch. The record reflects that Jose Trevino offered no rebuttal evidence. For the reasons stated above, the district court could reasonably conclude Jose Trevino was aware that drug proceeds were involved.

Additionally, Jose Trevino has not shown that the district court's conclusion that, in light of the trial evidence, "the calculated base is easily over [$]20 million" is clearly erroneous either. As the government points out, after forfeiture, the horses alone sold for about $9 million. The probation officer described $16,272,011.16 paid for horses and an additional $8,794,264.21 paid for horse expenses. Jose Trevino does not offer or point to any evidence to rebut this finding. Accordingly, his sentence is affirmed.

### 3. *Garcia–Solis's Sentence*

Garcia–Solis similarly challenges the twenty-level increase for the value of the laundered funds. He contends that he entered the conspiracy late, and therefore, he participated in only "two horse sales with a value of $510,900." But, as the government points out, at sentencing Agent Lawson testified that Garcia–Solis was involved in more than $9 million to $16 million in horse purchases from 2010–2012. In light of this evidence, the district court's factual finding that Garcia–Solis was involved in more than $7,000,000 in money laundering was "plausible in light of the record as a whole," *Alaniz*, 726 F.3d at 622 (internal quotation marks omitted). Thus, his sentence is affirmed.

### III.  CONCLUSION

For the foregoing reasons, we REVERSE Eusevio Huitron's conviction and RENDER a judgment of acquittal. We also VACATE Francisco Antonio Colorado Cessa's conviction, sentence, and money judgment; and we REMAND for proceedings consistent with this opinion. We AFFIRM the sentences and convictions in all other respects.